IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2012

# ANDREW LEE MOATS, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 96686    Bob R. McGee, Judge**

**No. E2011-02549-CCA-R3-PC - Filed January 22, 2013**

The Petitioner, Andrew Lee Moats, Jr., filed a petition for writ of error coram nobis alleging that newly discovered evidence—a recorded interview with Marlene Walker and the prior criminal record of Richard Breeden—mandated a new trial. He further argued that he was entitled to relief because the State failed to disclose this evidence and failed "to reveal all deals with witnesses." The Knox County Criminal Court summarily dismissed the petition concluding that the Petitioner did not state a cognizable claim for coram nobis relief. Following a review of the record, we conclude that the Petitioner has failed to allege the existence of subsequently or newly discovered evidence that would warrant relief under a writ of error coram nobis. The order of summary dismissal is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Andrew Lee Moats, Jr., Pikeville, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; and Randall E. Nichols, District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

In 1997, the Petitioner was convicted by a Knox County jury of first degree murder. The trial court imposed a life sentence. The facts upon which the Petitioner was convicted have previously been summarized by this court as follows:

The state presented the following proof. Jeffery Mayes testified that he met the victim, Dallas Walker, at the victim's home two days prior to the victim's murder. Mayes received over five hundred dollars from the victim to purchase marijuana for the victim and Carl Neer. Mayes gave the [Petitioner] the money to purchase the marijuana. The [Petitioner] and Mayes attempted to obtain the marijuana, but they were unsuccessful.

Richard Breeden testified that the day before the victim's murder, June 8, 1990, he talked to the victim about the victim's deal with the [Petitioner]. Breeden had recently traded his Jeep and an Intratec nine millimeter automatic pistol for the [Petitioner's] Lincoln Continental. Around dusk that evening, Breeden, the victim, Marlene Walker, Chuck Walker and Bill Cox went to the [Petitioner's] house in Breeden's Lincoln. The victim, the [Petitioner] and Mayes talked outside in front of the [Petitioner's] home. Breeden was unable to hear this conversation, but he testified that it was a very brief conversation and he saw no violent gestures. After this conversation, the five of them drove to Maynardville in search of the [Petitioner's] Jeep. Four hundred dollars was still owed on the Lincoln for which Breeden traded the Jeep; therefore, Breeden was unable to obtain a clear title to the Lincoln. They did not locate the [Petitioner's] Jeep, and they returned to Marlene Walker's home.

Breeden testified that the following morning, the victim and Carl Neer came to his house in the victim's creme-colored Ford Escort. The victim drove Neer and Breeden to the [Petitioner's] home to inquire about his money, but the [Petitioner] was not at home. In the afternoon, Mayes called Breeden and told him that they had half the victim's money, and they would obtain the other half by the end of the day. Mayes testified he told Breeden that the [Petitioner] had all the victim's money. Breeden notified the victim of the situation. The victim returned to Breeden's house with Carl Neer, and they drove to the [Petitioner's] home again. The victim parked his car at a Mrs. Winner's restaurant near the [Petitioner's] home. Mayes exited the [Petitioner's] home where he met Breeden near the street. Mayes told Breeden, who was carrying a .25-caliber gun, it would take another 30-45 minutes to obtain the victim's money. The victim and Breeden left, but Breeden returned to the [Petitioner's] house later to inquire about the victim's money. Mayes testified that he saw a nine millimeter gun laying in the passenger's seat of Breeden's Lincoln while he and Breeden were talking. Breeden testified that Mayes seemed very nervous during this meeting.

In addition to the meetings for which Breeden testified, Mayes testified about a meeting in Marlene Walker's driveway among Mayes, the victim and the [Petitioner], which occurred on the night before or the day of the victim's murder. The victim asked Mayes about his money, and Mayes told the victim that the [Petitioner] had the money. The victim and the [Petitioner] discussed something calmly, but Mayes was unable to hear the conversation.

Carl Neer testified that he arrived at the victim's house around 8:30 p.m. on the evening of the murder. Neer testified that he was not there in the morning as Breeden had testified. Neer testified that he, the victim and Marlene Walker drove to Breeden's house in the victim's Ford Escort. The four of them went to the [Petitioner's] house, Breeden knocked on the door, and Breeden returned to the car saying no one was there. They parked across the street from the [Petitioner's] house at a fast food restaurant. Neer described the meeting of Breeden and Mayes consistently with the testimony of Breeden and Mayes. The victim returned Breeden to his home and drove Marlene Walker and Neer to the victim's home.

Marlene Walker left the victim's home, but returned ten to fifteen minutes later. Walker told the victim that the [Petitioner] had returned home and suggested that the victim should go to the [Petitioner's] to retrieve his money. The victim and Neer drove to the [Petitioner's] home around 11:00 p.m. on June 9, 1990. Because the victim did not see the [Petitioner's] Jeep at the [Petitioner's] home, he decided to park in a parking lot near the [Petitioner's] home to watch and wait for the [Petitioner]. Neer testified that within five minutes a person exited the front door of the [Petitioner's] home. One to two minutes later, two more people exited the [Petitioner's] home. Neer saw a Jeep exit the [Petitioner's] home on a side street. The Jeep pulled in front of their car at an angle with the bright lights shining into the victim's car. The bright lights remained on the victim and Neer as they lifted their hands to cover their eyes. After ten to twelve seconds, the Jeep pulled door-to-door to the victim's car. According to Neer, the [Petitioner], the driver in the Jeep, said the victim's name and asked the victim if the victim had been looking for him. Neer did not hear the victim say anything. The [Petitioner] had a shotgun placed across his lap. The victim and Neer did not have guns in their hands at this time, but there were two guns in the car which were visible. Neer testified that the [Petitioner] shot the victim in the face within seconds or minutes of placing his Jeep door-to-door with the victim's car. After bringing himself off the floorboard, Neer exited the vehicle with the

.25-caliber gun and attempted to shoot at the Jeep. The gun would not discharge, and Neer threw it in a nearby yard.

Mayes was with the [Petitioner] when the victim was shot. Mayes testified that the [Petitioner] never talked about shooting someone that night. At first, Mayes testified that he saw the [Petitioner] put the shotgun in the Jeep a few minutes prior to the victim's shooting at the [Petitioner's] house. Mayes testified that the victim said something to the [Petitioner] before the [Petitioner] shot him, but Mayes could not hear the conversation. Upon cross examination, Mayes testified that the shotgun was already in the Jeep when he, the [Petitioner] and the [Petitioner's] girlfriend entered the Jeep. Additionally, Mayes confirmed his testimony in a prior proceeding that the [Petitioner] kept the shotgun in his Jeep most of the time. Mayes did not see the victim with a gun, but the [Petitioner] said the victim had a gun. Mayes's view into the victim's car was partially blocked by the [Petitioner] because Mayes was in the back seat of the Jeep. After shooting the victim, the [Petitioner] quickly drove away from the scene. The [Petitioner] or his girlfriend threw the shotgun out of the Jeep. The [Petitioner] drove himself, his girlfriend and Mayes into Kentucky, but they returned a couple of days later.

The [Petitioner] presented no proof.

State v. Andrew Lee Moats, Jr., aka, Butch Moats, No. 03C01-9805-CR-00184, 1999 WL 595417, at *1-3 (Tenn. Crim. App. Aug. 10, 1999), perm. appeal denied, (Tenn. Jan. 24, 2000).[1]

In his direct appeal to this court, the Petitioner challenged the sufficiency of the evidence supporting his murder conviction, contending that there was inadequate proof of intent, deliberation, and premeditation. Id. at *1. This court determined that the jury rejected the Petitioner's theory of self-defense and that the evidence was sufficient to support the conviction. Id. at *3-5. The Tennessee Supreme Court denied the Petitioner's application for permission to appeal.

---

[1] The Petitioner was previously convicted of first degree murder for shooting and killing the victim after a trial in 1991, but that conviction was reversed on appeal and remanded for a new trial. See State v. Andrew Lee Moats, No. 03C01-9302-CR-00038, 1994 WL 160154 (Tenn. Crim. App. May 2, 1994), perm. app. granted, (Tenn. Oct. 3, 1994). On September 11, 1995, the Tennessee Supreme Court affirmed the reversal by this court. See State v. Moats, 906 S.W.2d 431 (Tenn. 1995). The Petitioner was subsequently retried and convicted of first degree murder on December 3, 1997.

In 2001, the Petitioner filed a pro se petition for post-conviction relief alleging numerous theories. Counsel was appointed, and an amended petition was filed. At the evidentiary hearing, post-conviction counsel made an oral motion to withdraw all allegations in the petition except for the allegation of ineffective assistance of counsel, which the post-conviction court granted. See Andrew Lee Moats v. State, No. E2003-00402-CCA-R3-PC, 2003 WL 22326976, at *3 (Tenn. Crim. App. Oct. 9, 2003); perm. app. denied, (Tenn. Jan. 26, 2004). After hearing the evidence, the post-conviction court denied relief. Id.

On appeal to this court, the Petitioner argued a single claim of ineffective assistance:

> that Counsel's statement to the Petitioner following his conviction, "I should have put you on," shows by clear and convincing evidence that it was Counsel's unilateral decision to not have the Petitioner testify "that was the reason [the Petitioner] was prevented from testifying, which testimony could have changed the outcome of the trial."

Id. at *6. This court affirmed the judgment of the post-conviction court. Id. at *7. The Petitioner raised two additional grounds during the post-conviction hearing regarding ineffective assistance of counsel: "(1) failure of Counsel to call the witness Marlene Walker to testify; and (2) failure of Counsel to advise the Petitioner of a potential plea bargain with the State." Id. at *6 n.2. However, the Petitioner waived these additional claims on appeal for failing to raise them in his appellate brief. Id. (citing Tenn. R. App. P. 13(b); Nichols v. State, 90 S.W.3d 576, 607 (Tenn. 2002)). Our supreme court denied the Petitioner's application for permission to appeal.

On March 3, 2011, the Petitioner filed a petition for writ of error coram nobis. He based his claim for relief on alleged newly discovered evidence, specifically (1) a written statement of Marlene Walker taken by the Knoxville Police Department shortly after the murder of which the Petitioner was convicted and (2) the criminal history of Richard Breeden. The Petitioner further submitted that the State failed to disclose this exculpatory evidence and that the State failed "to reveal all deals with witnesses." He attached to the petition Marlene Walker's statement and documents reflecting relevant portions of Richard Breeden's criminal history.

The Petitioner provided that "the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial" because "the new evidence establishe[d] that Petitioner acted in self-defense and . . . is actually innocent of those charges for which he stands convicted." The Petitioner further stated that "both the statement and testimony of [Marlene] Walker may have resulted in a different judgment

because proof in this regard show[ed] that the alleged victim and his friends were stalking the Petitioner[,]" serving "to rebut any theory that the alleged unlawful killing was the result of a premeditated act." He also contended that this statement "show[ed] that [Marlene] Walker, who had personal knowledge of those facts leading up to the incident, was very uncooperative" and "blatantly withheld . . . facts from the investigation." According to the Petitioner, this statement "also show[ed] that the alleged victim and his friends both warned and threatened the witness in this cause" prior to the shooting.

Regarding the witness Richard Breeden, the Petitioner submitted that Breeden "committed several criminal acts against Marlene Walker to prevent further cooperation regarding the investigation of this case." According to the Petitioner, following the above-referenced interview of Marlene Walker, Breeden was charged with committing the following offenses against Marlene Walker: aggravated burglary; aggravated assault; and attempted aggravated rape. He was also charged with possession of a weapon during the commission of those crimes. The Petitioner argued that "[a]ll of these acts were committed to instill additional fears of retribution within the witness."

The Petitioner then stated that "he was not at fault in failing to present any of the newly discovered evidence at the appropriate time . . . because the newly discovered evidence was not known to exist at the time of Petitioner's trial." The Petitioner averred that he "had no knowledge that [Marlene] Walker even gave a statement until September of 2010 when Petitioner received a copy of the statement"[2] and that he "thereafter learned that Richard Breeden had committed various criminal acts against the witness."

Regarding the Petitioner's claim that the State failed to disclose exculpatory evidence, the Petitioner contended that the State "unlawfully withheld that statement of [Marlene] Walker which show[ed] that Petitioner is actually innocent of those charges for which he stands convicted." According to the Petitioner, the statement showed that "the alleged victim and his friends were in possession of weapons as they stalked the Petitioner[,]" that "they monitored police activity through use of a scanner[,]" and that "they warned and threatened Ms. Walker to silence her regarding the actual facts of this case." The Petitioner further asserted that the State "withheld the prior criminal record of Richard Breeden which would show that he had both a propensity and motivation to make and, in fact, did make false allegations against the Petitioner."

Finally, the Petitioner asserted that the State failed to "reveal all deals with witnesses" in violation of his due process rights. Specifically, the Petitioner stated, "The State improperly entered into an unlawful agreement whereby it agreed to offer and promise and,

---

[2] In his appellate brief, the Petitioner states that he "accessed" the statement "in 2008."

in fact, offered and promised Richard [Breeden] leniency from criminal prosecution in exchange for his testimony against Petitioner." He then noted the charges against Richard Breeden in relation to Marlene Walker—aggravated burglary, aggravated assault, attempted aggravated rape, and possession of a weapon—and claimed that Richard Breeden was "granted leniency from criminal prosecution in this matter in return for his testimony against Petitioner." According to the Petitioner, "[t]hese charges were actually reduced to a single charge of attempted burglary."

The State did not file a response to the petition. The Petitioner filed a motion for default judgment.

In its May 20, 2011 order summarily dismissing the petition, the coram nobis court determined that the Petitioner did not state a cognizable claim for relief:

> In support for this ground of relief [P]etitioner has attached a transcript of a statement of [Marlene] Walker . . . . Petitioner contends that this is newly discovered evidence which, if presented during the trial of his case, would probably have caused a different result. This court notes first that the evidence is not new. It was obviously known to the police, and therefore to the prosecution, almost immediately in the investigation. The fact that [P]etitioner did not know about the statement, if true, does not make the evidence newly discovered. Further, this court has reviewed the statement and finds that, had it been introduced at trial, it would not have affected the result. Viewed in the light most favorable to [P]etitioner, the statement only reveals that the victim and [P]etitioner were having a dispute over money and that on the day of the murder, [P]etitioner and some of his friends made arrangements to meet the victim and some of his friends over the issue of the money. The statement shows clearly that Ms. Walker believed that [P]etitioner "set up" the victim. Petitioner argues that Ms. Walker's reluctance to discuss whether the victim and his friends had weapons proves that he, Petitioner, was the victim of armed stalkers and that therefore the killing could not have been premeditated. In the statement, [the investigator] states to Ms. Walker that he already knew, from other sources, that the victim and at least one of his friends were armed. Nothing in the statement suggests that Ms. Walker witnessed the shooting or had any other information about it. This court concluded therefore that the evidence is not newly discovered and, if presented at trial, would not have changed the outcome.

Regarding the failure to disclose exculpatory evidence, the coram nobis court ruled that "the Brady issue . . . was raised and litigated in [P]etitioner's petition for post-conviction relief."

-7-

Thus, "the issue was litigated via another review procedure and therefore cannot be the basis for a writ of error coram nobis." The coram nobis court also characterized the Petitioner's issue of failure to reveal all deals with witnesses as a <u>Brady</u> issue: "The state's <u>Brady</u> obligation is to reveal exculpatory evidence helpful to impeach the state's witnesses." The court again ruled that the <u>Brady</u> issue was previously litigated "in the post-conviction relief procedure and therefore cannot be the basis for the writ of error coram nobis."[3]

The Petitioner attempted, unsuccessfully, through motions to persuade the coram nobis court to reconsider and amend its findings and conclusions supporting summary dismissal of the petition. We thereafter granted the Petitioner's motion to waive the untimely filing of his notice of appeal document. The case is now before us for our review.

## ANALYSIS

A writ of error coram nobis is available to a defendant in a criminal prosecution. Tennessee Code Annotated section 40-26-105 provides, in pertinent part, as follows:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

> (c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c).

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." <u>State v. Mixon</u>, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment."

---

[3] Because the coram nobis court relied on the post-conviction proceedings in rendering its decision, we take judicial notice of those proceedings.

Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 375.

To establish that he is entitled to a new trial, the Petitioner must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. Hart, 911 S.W.2d at 374-75.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003).

In State v. Vasques, our supreme court noted that "Tennessee courts have struggled with the proper standard to be applied in the determination of whether and when coram nobis relief is appropriate in a criminal case." 221 S.W.3d 514, 525 (Tenn. 2007). The court further explained that some courts had looked at whether new evidence "would have" resulted in a different judgment and some courts had used a "may have" standard. Id. Our high court reasoned that "the 'may have' standard, if interpreted literally, is too lenient in the common law context of writ of error coram nobis." Id. at 527. Thus, in Vasques, the Tennessee Supreme Court clarified the standard that should be used, explaining as follows:

> [W]e hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis

as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense. In our view, this interpretation upholds the traditional, discretionary authority of our trial judges to consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome.

Id. at 527-28.

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. Tenn. Code Ann. §§ 27-7-103, 40-26-105; Mixon, 983 S.W.2d at 671. The one-year statute of limitations may be tolled only when necessary so as not to offend due process requirements. Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. Harris, 102 S.W.3d at 593 (citing Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995)).

Based on the record, it is clear that the petition was filed many years after the statute of limitations had expired. The record contains no pleading filed by the State in response to the petition,[4] and "the statute of limitations [applicable to writs of error coram nobis] is an affirmative defense which must be specifically plead or is deemed waived." Harris, 102 S.W.3d at 593; Newsome v. State, 995 S.W.2d 129, 133 n.5 (Tenn. Crim. App. 1998). However, the failure of the State to specifically plead the affirmative defense of statute of limitations does not result in waiver of the issue when the petitioner has asked that the statute of limitations be tolled on due process grounds. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012). In such circumstances, the petitioner cannot reasonably claim a lack of notice or an opportunity to rebut the defense. Id.

While the coram nobis court in this case did not summarily dismiss the petition as time-barred, the State takes the position on appeal that summary dismissal was proper because the petition was filed outside the one-year limitations period. The State does not now dispute that it failed to raise the statute of limitations below, but citing to Wilson, 367 S.W.3d at 234, it contends that "the petition reflects that the [P]etitioner was on notice that

---

[4] We note that the coram nobis court's order of summary dismissal was filed almost two and half months after the petition was filed. No responsive pleading had been filed by the State, and the Petitioner had filed a motion for default judgment due to the State's failure to file any response.

-10-

his issues were not raised 'at the appropriate time.'" The State relies on the portion of the coram nobis petition where the Petitioner stated that "he was not at fault in failing to present any of the newly discovered evidence at the appropriate time . . . because the newly discovered evidence was not known to exist at the time of Petitioner's trial." We disagree with the State that this language is sufficient for us to conclude that the Petitioner was on notice of the statute of limitations. The language used by the Petitioner simply references the standard for seeking coram nobis relief and does not mention or imply knowledge of the one-year statute of limitations or make any argument for tolling based on principles of due process. Under the circumstances presented here, because the statute of limitations was not raised as an affirmative defense below, the State is precluded from raising the statute of limitations on appeal. We will proceed to examine the Petitioner's claims.[5]

The Petitioner raises numerous challenges to the findings of the coram nobis court on appeal: (1) the coram nobis court abused its discretion "by finding the [Marlene] Walker statement [was] not newly discovered evidence," regardless of whether "the Petitioner did not know about the statement"; (2) the coram nobis court abused its discretion "by finding the [Marlene] Walker evidence would not have affected the verdict"; and (3) the coram nobis court abused its discretion by determining that the Brady issue "was raised and litigated in Petitioner's post-conviction relief." We will address the issues in turn.

*I. Statement of Marlene Walker.*

We agree with the rationale provided by the coram nobis court regarding the statement of Marlene Walker, i.e, the Petitioner has failed to establish that the evidence was newly discovered or that it might have resulted in a different judgment had it been presented at trial. Marlene Walker did not testify at the Petitioner's trial.[6] Even if it is true that the Petitioner only recently received the written statement, the Petitioner was aware at the time of trial of what the substance of Ms. Walker's testimony would have been. In the post-conviction appeal, this court summarized the Petitioner's testimony, in relevant part, at the post-conviction hearing as follows:

[The Petitioner] stated that he knew of a witness, Marlene Walker, who "was a very important person on this case and could have testified in my behalf." The Petitioner testified that "[s]he was a hostile witness, yes, but she was one

---

[5] Because the statute of limitations was not raised an affirmative defense, we do not have to address whether due process requires the limitations period to be tolled pursuant to the analysis in Workman.

[6] The State argues that the statement is inadmissible hearsay because Marlene Walker was not called as a witness at trial. Although true, the Petitioner is using the statement as evidence of what Marlene Walker's testimony would have been had she been presented as a witness at his trial.

that could prove that them people had plotted and planned to kill me before [the shooting] ever happened." The Petitioner stated that Counsel knew about this witness but never called her to testify. The Petitioner testified that "I looked around the courtroom two or three times when we was going through trial, and I never s[aw] her."

Moats, 2003 WL 22326976, at *3. Trial counsel responded to this allegation:

Counsel testified that he could remember the name Marlene Walker but could not remember who she was or what her relationship was to the Petitioner's case. Counsel stated that Marlene Walker "would not have been anyone that I would have subpoenaed to testify."

Id. at *5. This new statement only provides a more complete description of her possible testimony. Moreover, the post-conviction court considered the issue of trial counsel's failure to call Marlene Walker as a witness.[7] The Petitioner then appealed to this court raising only one issue of ineffective assistance of counsel. Therefore, this court treated his allegation as waived. Id. at *6 n.2.

It is fundamental that "[t]he [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition." Kenneth C. Stomm v. State, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App. May 12, 1992); see also Tenn. Code Ann. § 40-26-105; Wlodarz v. State, 361 S.W.3d 490, 506 (Tenn. 2012). The fact that the Petitioner may not have received the statement until 2010 is inconsequential; the issue of Marlene Walker's possible testimony was known at trial and raised at the post-conviction level.

We agree with the coram nobis court that the statement or the proposed testimony of Marlene Walker does little to enhance the Petitioner's argument of self-defense or actual innocence, i.e., it would not have affected the verdict. In reviewing the sufficiency of the evidence on direct appeal, this court summarized the evidence as follows:

Neer testified that during the encounter with the [Petitioner], there were two guns in the victim's car. Mayes testified that the [Petitioner] had a shotgun across his lap when he was talking to the victim.

---

[7] The Petitioner did not call Marlene Walker as a witness at the post-conviction hearing.

When the [Petitioner] approached the victim's car, he first parked directly facing the car with his bright lights shining on the victim and Neer for ten to twelve seconds. This time interval gave the [Petitioner] adequate time to decide what action he wanted to take next. He pulled his Jeep door-to-door with the victim's car so that he and the victim were in close proximity and conversed with the victim while holding a shotgun across his lap. Without any evidence of provocation or threatening conduct by the victim, the [Petitioner] shot the victim in the face at near point blank range.

. . . .

Based upon the fact that one of the two pistols which were laying on the floorboard hump prior to the shooting was found in the floor beneath the victim's body, the [Petitioner] argues that the victim had grabbed the weapon and that this circumstance supports his theory of self-defense. Quite possibly it does, but the jury has declined to attach any significance to this equivocal physical fact of the gun's discovered position, and no one testified that the victim reached for or used the weapon. As pointed out above, the appellate court may not reweigh nor reevaluate the evidence.

Moats, 1999 WL 595417, at *4. Here, the jury was presented with evidence that the victim was armed and rejected the Petitioner's claim of self-defense, as was their prerogative. In this regard, the Petitioner has failed to allege the existence of subsequently or newly discovered evidence that would warrant relief under a writ of error coram nobis.[8]

*II. Richard Breeden's Criminal History*

The Petitioner also alleges that the State violated his constitutional rights under Brady v. Maryland entitling him to coram nobis relief, by failing to provide Richard Breeden's criminal record, which would have disclosed a deal with Richard Breeden in exchange for his testimony against the Petitioner.

A petition for a writ of error coram nobis may be an appropriate remedy by which to seek relief from constitutional errors such as that asserted under Brady v. Maryland. Freshwater, 160 S.W.3d at 555-56. Under Brady v. Maryland, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. Evidence that is favorable to an accused includes proof which may be used to impeach the prosecution's

---

[8] Based upon the above rationale, we see no need in discuss Marlene Walker's statement further under a Brady v. Maryland analysis.

witnesses.  State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing Giglio v. United States, 405 U.S. 150 (1972)).  However, "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985).

Thus, a criminal defendant must satisfy the following four prerequisites in order to demonstrate a due process violation under Brady v. Maryland:

> 1.  The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2.  The State must have suppressed the information;
> 3.  The information must have been favorable to the accused; and
> 4.  The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).  The defendant has the burden of proving a Brady violation by a preponderance of the evidence.  Id.  "The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial."  Id.

Again, we agree with the rationale provided by the coram nobis court that the Petitioner's Brady claim was previously raised in the post-conviction proceedings.  While it is true that post-conviction counsel waived all issues other than ineffective assistance of counsel at the post-conviction hearing, the Brady claim was raised in the Petitioner's pro se petition for post-conviction relief.  In his pro se petition, the Petitioner raised as issues the failure of the State to disclose exculpatory evidence and the State's "failure to reveal all deal with witnesses."  The Petitioner asserted that the State "withheld the prior criminal records of the State's witnesses, which would reveal that the witnesses had both a propensity and a motivation to make and, in fact, did make false allegations against Petitioner, in exchange for favorable treatment being rendered to them by virtue of the deals."  Although the Petitioner is more specific in his coram nobis petition, specifically naming Richard Breeden, this is the same claim as raised in the pro se petition for post-conviction relief.

The issue is not whether the claim was actually litigated at the post-conviction level, but when the Petitioner, through the exercise of reasonable diligence, actually discovered the information.  The Petitioner was clearly aware by the time he filed his pro se petition for post-conviction relief in 2001of any deal Richard Breeden made with the State in exchange for his testimony.

-14-

Again, we note that "[t]he [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition." Kenneth C. Stomm v. State, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App. May 12, 1992); see also Tenn. Code Ann. § 40-26-105; Wlodarz, 361 S.W.3d at 506. The coram nobis court properly denied relief where the coram nobis petition was based, in part, on an issue that was included in the Petitioner's post-conviction petition. The Petitioner cannot show that he was without fault in failing to present the evidence at the proper time as required by Hart. 911 S.W.2d at 374-75.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the summary dismissal of the petition for writ of error coram nobis.

_____
D. KELLY THOMAS, JR., JUDGE